# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| MARC PEARSON, | ) | CASE NO. 5:14-cv-634 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| FIRSTENERGY CORP. PENSION PLAN, | ) | |
| et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is defendants' motion for summary judgment on Counts One and Two of the First Amended Complaint and/or judgment on the administrative record on Count One (Doc. No. 40 ("MSJ/JAR")). Plaintiff opposes the motion (Doc. No. 44 (Memorandum in response ["Opp'n"])), and defendants have filed a reply (Doc. No. 46 ("Reply")). Plaintiff has also sought leave to file a sur-reply, *instanter* (Doc. No. 47 (Motion to File Sur-Reply ["Mot. Sur-Reply"])). Plaintiff's motion for leave is granted, and, for the reasons set forth below, defendants' motion for summary judgment and/or judgment on the administrative record is also granted.

## I. BACKGROUND

In 1998, Duquesne Light Company ("DLC") recruited plaintiff Marc Pearson ("plaintiff" or "Pearson") to work at its Beaver Valley generation plant. Because a change in employment would require plaintiff to relocate his family and abandon his consulting business, plaintiff negotiated an arrangement whereby he would obtain ten (10) years of pension credit at DLC after five (5) years of employment "(which he was informed by DLC and understood would get him a full pension from DLC as of age 60) and a one-year severance package." (Doc.

No. 32 (First Amended Complaint ["FAC"]) ¶ 8.) The agreement also provided for a generous allotment of vacation time.[1] (Doc. No. 39 (Deposition of Marc Pearson ["Pearson Dep."]) at 568.)

By a letter dated July 8, 1998, DLC promised Pearson a "special retirement program," which DLC explained to Pearson was the way it would ensure he received the negotiated two-for-one service credit arrangement when calculating his DLC pension. (FAC ¶ 10; Doc. No. 40-20 (MSJ/JAR, Ex. B, at 1038.[2]) Pearson was advised by DLC that the two-for-one service credit  formula would be applied to all of his DLC pension benefits. (Doc. No. 44-7 (Declaration of Plaintiff Marc Pearson ["Pearson Decl."]) ¶ 3.) It was Pearson's understanding that, in order to receive the promised ten (10) years of service credit under the DLC pension plan, he would have to work for DLC for five (5) years (until July 2003). (FAC ¶ 11.)

At the time Pearson began his employment with DLC, in July 1998, as the "Technical Assistant to the President, Generation Group and Chief Nuclear Officer[,]" he was 45 years of age. (*Id*. ¶ 9.) Pearson worked for DLC until 1999 when defendant FirstEnergy Corp. ("FE") began a process by which it eventually acquired (through defendant First Energy Nuclear Operating Company ("FENOC")) 100% ownership of the Beaver Valley plant. The acquisition occurred via an "asset swap" with DLC in which FE and DLC exchanged full ownership of certain then-jointly owned assets. (Pearson Dep. at 573.) According to Pearson, during this process, FENOC contacted certain DLC management employees who were then working at the

---

[1] The DLC pension agreement was memorialized in a document entitled "Summary of Unfunded Supplemental Pension Agreement." (Doc. No. 39-1 at 709.)

[2] All page number references are to the page identification number generated by the Court's electronic docketing system.

Beaver Valley plant—including Pearson—to determine if they wanted to continue to work at the plant as FENOC employees. (*Id*. 573-74.)

The first offer letter plaintiff received from FE was dated July 29, 1999. (Doc. No. 39-1 (July 29, 1999 Offer Letter ["1st Offer Letter"]) at 705.) With respect to plaintiff's pension agreement with DLC, the letter provided:

> You will receive the FirstEnergy benefits programs that are available to comparable non-union employees at FirstEnergy. However, based on your special pension benefit agreement with DLC, a modification as to how you are treated under the FirstEnergy pension benefit is as follows: If you are an employee of the Company as of December 31, 2001, your Company service for the purposes of calculating the supplemental pension benefit will be increased to seven (7) years. Additional pension service after that date will be determined in a manner consistent with other FE employees. This grant of additional service does not change the 5-year vesting requirement which in your case will be met on July 13, 2003.

(*Id*.)

At his deposition, plaintiff testified that he was disappointed when he received the first offer letter because it did not appear to take into account "the contract" he had with DLC. (Pearson Dep. at 579-80.) He set up a meeting with two employees of the Human Resources Department at FE—Steve Mileski and Bob Mucci—to further discuss the matter. (*Id*. at 580.) During the meeting, plaintiff discussed with the FE employees three aspects of the offer letter: (1) that it did not mention the severance agreement Pearson had negotiated with DLC; (2) that it did not include vacation time; and (3) that the "pension write-up was not the same as" the agreement with DLC. (*Id*.) With respect to the severance agreement, plaintiff advised Mileski and Mucci that it had to be added to the offer letter. As to vacation, plaintiff states that he was assured that whatever vacation he had with DLC would be carried over to his employment with FENOC. (*Id*.)

3

According to plaintiff, the three men spent the majority of the meeting talking about his pension benefits. (*Id*. at 581.) Plaintiff raised the fact that he did not believe that the terms contained in the offer letter assured him that he would receive the "two-for-one" service credit arrangement he had negotiated with DLC. Mucci essentially confirmed Pearson's conclusion. Mucci explained that, by December 31, 2001, plaintiff would have 7 years of service, by the end of 2002 he would add another year, and that by July, 2003 (the vesting date), Pearson would have another one-half year of service, giving him 8.5 years of credit. Plaintiff responded by complaining, "[t]hat doesn't give me 10 [years,]" noting that even if the additional time before the switch over to FE was included, he would only have 9 years and 9 months service by July, 2003. (*Id*. at 581-83.) The FE employees explained that the FE pension program was different, and that FE could not calculate the benefits the way it had been done at DLC. (*Id*. at 586.) Nonetheless, Mileski assured plaintiff that the way FE calculated bonuses would more than make up for any reduction in pension benefits. (*Id*. at 583.) Plaintiff concedes that he agreed to this because everyone associated with the plant was very busy with the switch over, and he did not want to deal with it, and because he did not plan on leaving FE in 2003. He, therefore, told Mileski, "Sounds good to me." (*Id*. at 583-84.)

Following the meeting, plaintiff received a second offer letter. This second written correspondence, dated August 23, 1999, indicated that its purpose was to "clarify the transition of certain entitlements granted to you by the Duquesne Light Company (DLC) . . . ." (Doc. No. 39-1 (Aug. 23, 1999 Offer Letter ["2nd Offer Letter"]) at 706.) Unlike the earlier letter, this document specifically referenced severance and vacation benefits, but it contained the same language relative to pension benefits that was in the first letter. (*Id*.) Plaintiff concedes that the

4

language explaining the pension benefits, identical in both letters, was neither unclear nor ambiguous. (Pearson Dep. at 606-07[3].)

Plaintiff made a handwritten addition to the August 23, 1999 letter. Immediately above his signature agreeing to the transition terms "as described" in the letter, plaintiff wrote:

> Additionally, as discussed between Lew Myers and Marc Pearson on 8/30/99 when this letter was received, it is understood that FirstEnergy Corp. will enter into a contract with Marc Pearson when direstiture [sic] actually occurs. It is also understood that the severance package (one-year salary) will continue to exist, especially through the pension vesting date of July 13, 2003.

(2nd Offer Letter at 707.) Plaintiff, however, did not handwrite any remarks about the pension benefits language. (*See id*.)

Pearson began his employment with FENOC shortly after receiving, and signing, the second offer letter. Later that year (November 1999), non-union employees of the Beaver Valley plant received a newsletter from FE welcoming the former DLC employees to the "FirstEnergy family[,]" and summarizing the various benefits to which they were entitled as FENOC employees. (Doc. No. 37-2 (November 1999 Newsletter ["1999 Newsletter"]) at 350.) During this same time period, all executive level employees—including plaintiff—received a document that contained a summary of the benefits available to executive level employees. (Doc. No. 37-4 (Summary of Compensation and Benefits Programs Available to Executive Level Employees ["Executive Letter"]), beginning at 362.) Among the benefits identified and discussed in the Executive Letter, was the Supplemental Pension Benefit mentioned in the offer

---

[3] In fact, plaintiff testified that the only thing he was unclear about was how the language would ensure that he would have the requisite 10 years of service. (*Id*. at 606.)

5

letters.[4] (*Id.* at 367.) Mileski offered un-contradicted deposition testimony to the effect that he, and the human resources department of FE, always endeavored to ensure that these types of documents accurately reflected the benefits available to employees, and further confirmed that the information in the Executive Letter was accurate. (Doc. No. 37 (Deposition of Steve Mileski ["Mileski Dep."]) at 263-67, 303-04.)

In October 2002, each FE employee received a personalized "FirstEnergy Compensation and Benefits Statement[,]' which "detail[ed each employee's] current plan features and how the value of [the employee's] benefits ha[d] grown." (Doc. No. 39-4 (2002 Personalized Annual Compensation and Benefits Statement ["2002 Ben. Stm."]) beginning at 723 and cover letter at 724.) Plaintiff remembered receiving this document, which provided that his age 65 accrued pension monthly benefit, as of September 1, 2002, was $1,069.00. (*Id.* at 731; Pearson Dep. at 619, 621.) While plaintiff thought this number would have been correct for a "normal employee," he assumed that his monthly accrued amount was higher because of his former arrangement with DLC.[5] (*Id.* at 621-22.) Even though the document (and the letter attached thereto), instructed the employee to contact his local human resources representative if he believed that any of the personal information in the statement was inaccurate, plaintiff testified that he did not contact human resources because he believed that the document merely

---

[4] Under the heading "Executive Deferred Compensation Plan (EDCP)," the Executive Letter provided:

> The EDCP also provides a Supplemental Pension Benefit which makes up for any reduction in an executive's qualified pension plan benefit as a result of participation in the deferral program of the EDCP, due to Internal Revenue Code limitations, or due to the exclusion of annual incentive awards from qualified pension earnings."

(Executive Letter at 367.)

[5] While the document indicated that the "benefits have been calculated using all applicable Plan formulas[,]" and that the "highest benefit [was] shown[,]" plaintiff testified that he "did not expect the terms of [his] contract to be reflected in this automated document." (Pearson Dep. at 622; *see* 2002 Ben. Stm. at 735.)

represented propaganda designed to show how generous FE was to its employees. (Pearson Dep. at 623-24.)

Plaintiff's employment with FENOC was short-lived. He was separated from FENOC in November 2003 as part of a reduction in force that followed the reorganization of the Beaver Valley plant. (FAC ¶ 25; Pearson Dep. at 610.) In January, 2004, in connection with his termination, Pearson signed a separation agreement entitled "Agreement to Release in Full." (FAC ¶ 26; Pearson Dep. at 607-09; Doc. No. 39-2 ("Separation Agreement") at 712.) In exchange for $137,563 and other consideration, Pearson gave a broad release of claims that provided, in relevant part, as follows:

**Section 2. Release and Covenant Not to Sue**

In consideration of the receipt of the benefits outlined in Section I, I agree for myself, my heirs, executors, administrators, agents, assigns, and anyone else who may lawfully assert a claim on my behalf, to release and forever discharge the Company, its subsidiaries, employees, officers, and directors (collectively, the "Company") from any and all claims, liabilities, demands and causes of action, known or unknown, fixed or contingent, I may now have or claim to have against the Company relating to my employment with the Company, including but not limited to my separation from employment with the Company and do hereby covenant that I have not and will not file a lawsuit to assert such claims.

Such claims and rights include those of which I am aware and those for which I may be unaware. Such claims extend to those arising under any contract and those involving any tort or personal injury I may have suffered. Such claims and rights also include those which may arise under any federal, state or local statute or under common law. . . .

***

The only exception to this Release and waiver is with respect to claims for benefits under applicable Workers' Compensation laws for occupational injuries or illnesses….

(Separation Agreement at 712-13 (bolding added)).

7

As part of his discharge, plaintiff received a document explaining his benefits. (Doc. No. 39-2 (Exit Interview Benefits Information ["Ex. Int. Ben. Info."]) at 715-21.) Under the heading "Pension Plan," the document provided, in part:

> If at the time of your severance from the Company, you are between the age of 50 and 54 with 10 or more years of service, you will be eligible to receive a reduced benefit as early as age 55 and a full-unreduced benefit at age 60 provided that you are eligible for and have elected severance benefits under the FirstEnergy Severance Benefit Plan by signing and not revoking the required release. The amount of the pension reduction will be determined by using the early reduction factors.

(*Id*. at 719.) Plaintiff testified that, when he first read this statement, "it meant to me I wasn't going to get it because I had 9 years and 9 months." (Pearson Dep. at 617.) When asked what he meant by "it," Pearson explained that he knew from this notice that he "was not going to have an opportunity to apply at age 60 for a full pension, because [he] did not have 10 or more years of service." (*Id*.) Plaintiff signed the benefits notice, at the time of his exit interview, on January 3, 2004, signifying that he understood his "benefits and the rights under the Plans[.]" (Ex. Int. Ben. Info. at 721.)

On October 22, 2004, plaintiff received a letter from William Meader, Secretary of the Retirement Board for FE. (Doc. No. 39-5 ("Oct. 22, 2004 Letter").) The letter advised Pearson that his "monthly accrued [and] vested—age 65—pension payable" under the FE Pension Plan was $1,256.18, of which $233.83 represented the contribution from DLC.[6] (*Id*. at 736.) While plaintiff conceded that this letter purported to identify a monthly pension benefit of $1,256.18—a number far lower than he had anticipated—plaintiff testified that the letter was

---

[6] The figure quoted in the letter included an asterisk directing the reader to the bottom of the letter where it stated that: *"This amount may be changed to reflect the effects of any court ordered restrictions—Qualified Domestic Relations Orders (QDROs), garnishments, etc.—or to correct for any errors due to incomplete and/or inaccurate data contained in your file."* (*Id*. (emphasis in original).)

confusing. Plaintiff noted that the letter carried a disclaimer on the bottom stating that the amount shown reflected the qualified pension and that the "TOTAL AMOUNT—QUALIFIED AND NON QUALIFIED WILL BE ADDRESSED IN A SEPARATE MAILNG." (*Id*. at 627; Oct. 22, 2004 letter at 736 (capitals in original).) In addition, plaintiff testified that, approximately two weeks later, he received a second letter from FE, signed by Mileski, indicating that he had ten years of vested service for purposes of his pension. (Pearson Dep. at 627-30.) It was undisputed that plaintiff did not produce this subsequent letter, and defendants have no record of any such letter. (*Id*. at 630-34.)

In 2005, because "he wanted to determine the amount of his monthly pension benefit from FENOC at age 60 (i.e., as of February 10, 2013), Pearson contacted" Meader and "informed Meader that Pearson had a special pension arrangement and that Pearson was entitled to receive a full pension at age 60, and asked that Meader calculate his monthly pension benefit." (FAC ¶ 28.) "Meader informed Pearson that his staff was too busy and that FE would not calculate the pension amount until [plaintiff] was closer to his actual benefit commencement date in 2013." (*Id*.) Pearson contacted Meader by telephone approximately every eighteen months thereafter but was repeatedly rebuffed by Meader. (*Id*. ¶ 29; Pearson Dep. at 664.) It was not until January 2013 that plaintiff received a written estimate of his pension benefit. (Doc. No. 40-7 (Qualified Pension Plan Calculation Statement, Dated 01-09-2013) beginning at 832; FAC ¶ 31.)

Plaintiff disputed the projected calculated amount and requested review by the FE Pension Plan Administrator ("Plan Administrator"). In a letter dated March 13, 2012, Meader denied Pearson's request to be credited with additional service, and specifically rejected

9

Pearson's contention that the "two-for-one" DLC arrangement should be applied to provide him with 10 years of vested service. (Doc. No. 40-4 (Plan Administrator Response ["Plan Adm. Resp."]).) Meader explained that the special two-for-one arrangement was "between you and the Duquesne Light Company[,]" and that FE tried to honor that arrangement by affording plaintiff additional service credit for purposes of the supplemental pension plan. (*Id*. at 806.)

Pearson ultimately filed an appeal with the FE Retirement Board. On September 25, 2013, Meader, on behalf of the Board, issued a decision denying plaintiff's appeal. (Doc. No. 40-5 (Retirement Board Appeal Decision ["Bd. Appeal"]) at 810-12.) Meader explained, in part, that the "Board based their decision to deny your appeal based on the following:

- Your period of employment, including your employment with Duquesne, was from July 13, 1988 through November 29, 2003. This is a period of sixty-five (65) months and resulted in you being vested in FirstEnergy's qualified pension plan.

- The Board scrutinized your employment contract with Duquesne, dated July 8, 1998, that provided you with two (2) years of pension service for every year of employment. That agreement permitted you to participate in a "**special retirement program**" (emphasis added), which was to credit you with two years of service for every year of actual company service. The "special retirement program" was not identified or defined in the agreement. The Committee does not believe that the "special retirement program" identified in the agreement was referencing FirstEnergy's qualified pension. Furthermore, such a commitment would not have been consistent with the terms of the qualified pension plan, which is an ERISA Plan, as there are no provisions in the Plan which provide the Company with the right to award additional years of service in circumstances such as yours. Therefore, it is the Committee's belief that it was the supplemental pension which was to provide for the additional service awarded under the Duquesne agreement.

- The FirstEnergy Letter Agreement dated July 29, 1999 included the language "You will receive the FirstEnergy benefits programs that are available to comparable non-union employees at FirstEnergy. However, **based on your special pension benefit agreement with DLC**, (emphasis added) a modification as to how you are treated under the FirstEnergy

10

pension benefit is as follows: if you are an employee of the Company as of December 31, 2001, your Company service for the purpose of calculating the **supplemental pension benefit** will be increased to seven (7) years. Additional pension service after that date will be determined in a manner consistent with other FE employees. This grant of additional service does not change the 5-year vesting requirements which in your case will be met on July 13, 2003."

As of December 31, 2001, you had forty-two (42) months of service, but were credited with seven (7) years or eighty-four (84) months of service under the supplemental pension plan which is in agreement with your contract with Duquesne [sic]. The Board viewed this July 29, 1999 agreement as an extension of your Duquesne contract through December 31, 2001, not additive.

Furthermore, the 1999 letter clearly identifies the supplemental pension as the plan under which you were being granted the additional years of credit and the plan that was referenced in your July 7, 1998 letter.

\*\*\*

(Bd. Appeal at 810-11 (all bolding in original).)

On March 23, 2014, plaintiff filed the present lawsuit.[7] In his First Amended Complaint, Pearson raised two causes of action. Count One alleged a wrongful denial of pension benefits under § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. In this first claim, plaintiff alleged that the FE Pension Plan and the Plan Fiduciary "arbitrarily and capriciously den[ied] his request for additional service credit . . . ." (FAC ¶¶ 39-40.) Count Two, entitled "Breach of Fiduciary Duty," alleged that FE and FENOC representatives, authorized by the Plan Administrator, made false representations to Pearson concerning the terms of the FE Pension Plan, and that plaintiff reasonably relied on these representations to his detriment. (*Id.* ¶¶ 45-55.)

---

[7] In addition to FE and FENOC, plaintiff also brought suit against FirstEnergy Corp. Pension Plan and FirstEnergy Corp. Retirement Board Plan Administrator.

11

Defendants now move for summary judgment on Counts One and Two and/or judgment on the administrative record as to Count One. They insist that the Board's denial of Pearson's administrative appeal was rational and reasonable given the facts and the evidence that was available during the administrative proceeding. Defendants further contend that plaintiff's breach of fiduciary claim is time-barred and legally deficient, and that plaintiff released both claims when he signed the Separation Agreement in 2004.

## II.  FRAMEWORK FOR ERISA CASES

The proper procedure for resolving ERISA actions for wrongful denial of benefits under § 1132(a)(1)(B) is in the nature of a review of the administrative record, and not by means of a motion for summary judgment. *Wilkins v. Baptist Healthcare Sys., Inc*., 150 F.3d 609, 616 (6th Cir. 1998). "Under *Wilkins*, the Court must conduct a *de novo* review of the administrative record unless the plan gives the plan administrator discretion to determine eligibility or to construe the plan's terms." *Sullivan v. Cap Gemini Ernst & Young U.S*., 518 F. Supp. 2d 983, 990 (N.D. Ohio 2007) (citation omitted). If the administrator is granted such discretion, an arbitrary and capricious standard applies. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). Such a review is typically limited to the evidence before the plan administrator at the time of the decision. *Wilkins*, 150 F.3d at 619 (Gilman, J., concurring). "The district court may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part." *Id*.

The Court's review of the plaintiff's denial of benefits claim is complicated by the

fact that defendants have interposed the waiver plaintiff signed in 2004 as a complete defense. Consideration of this defense, by its very nature, will require the Court to journey beyond the administrative record. Additionally, plaintiff has raised a second ERISA claim, sounding in breach of a fiduciary duty, which also requires consideration of matters beyond the administrative proceedings. Accordingly, the Court finds that the appropriate approach is to consider the merits of plaintiff's denial of benefits claim on the administrative record, while applying the summary judgment analysis to the waiver argument as to both claims along with all other arguments relating to plaintiff's breach of fiduciary duty claim. *See, e.g., Sullivan*, 518 F. Supp. 2d at 990 (applying summary judgment standard in deciding defendant's motion for entry of judgment in ERISA action based on contractual waiver of claims) (citing *Manley v. Plasti-Line, Inc*., 808 F.2d 468, 471 (6th Cir. 1987)). Additionally, while a discussion of waiver would ordinarily precede analysis of the merits of an ERISA claim, the Court finds, in this instance, it is best to begin with the FE Pension Plan itself, and the denial of benefits claim.

### III. MERITS OF THE DENIAL OF BENEFITS CLAIM

The parties agree that the "arbitrary and capricious" standard of review applies to the Board's decision. (Doc. No. 40-20 (Summary of FE Summary Plan Description["SPD"]) at 965 (identifying the Board as the "Plan Administrator" and granting it responsibility to "interpret[] the Plan" and to oversee "all aspects of administration of the Plan except management of assets of the Plan"); Opp'n at 1249 ("Here, the Plan confers broad discretionary authority on the Retirement Board, as the Plan Administrator, and so the deferential review standard applies.").)

Regarding the arbitrary and capricious standard, the Sixth Circuit has explained

13

that it "'is the least demanding form of judicial review of administrative action. . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'" *Abbott v. Pipefitters Local Union No. 522 Hosp., Med., & Life Ben. Plan*, 94 F.3d 236, 240 (6th Cir. 1996) (quoting *Perry v. United Food & Commercial Workers Dist. Unions 405 & 422*, 64 F.3d 238, 242 (6th Cir. 1995)). Applying such a standard, the plan administrator's decision will be upheld if it was "rational in light of the plan's provisions[,]" *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997) (quotation marks and citation omitted), and was not made in bad faith. *Adcock v. Firestone Tire & Rubber Co*., 822 F.2d 623, 626 (6th Cir. 1987).

In the Board's decision, Meader explained that, because FE Pension Plan was a qualified ERISA pension plan, it could not and did not provide for awarding additional years of service as plaintiff had negotiated with DLC. Instead, as was explained in the offer letters, FE attempted to honor the fact that Pearson had a special "two-for-one" arrangement with DLC by providing for additional service credit under FE's supplemental pension plan, which was not a qualified ERISA plan. (Bd. Appeal at 810.) According to Meader, such a conclusion was supported by FE's treatment of plaintiff's service credit under the supplemental plan. While plaintiff had only 42 months of service, as of December 31, 2001, he was credited with 84 months (or two times the service) for purposes of calculating the benefit under the supplemental plan. (*Id*.)

The Court finds this to be a reasoned explanation in support of the denial of plaintiff's claim. The FE Pension Plan is a qualified plan under ERISA, and, as such, it cannot discriminate against or in favor of any participant, even based upon a pre-exiting arrangement for

service credit. (Doc. No. 40-2 (Declaration of Christine Kuhlke ["Kuhlke Decl."]) ¶ 5.) Consistent with that, the FE Pension Plan and the "SPD" provide for service credit to be calculated on a "one-to-one" basis. (*Id.* ¶ 6; SPD at 956-57 (providing that "you will earn one year of credited service for each Plan Year . . . in which you are a participant"); Doc. No. 40-11 ("FE Pension Plan") at 899 (providing that "No 1999 FE Participant shall be entitled to duplicate credit for Years of Benefit Service for any period of employment.").)

The supplemental plan is not a qualified plan, and, as such, special arrangements can be made regarding service credit.[8] This is consistent with the July 1999 offer letter that provides that Pearson would receive the same pension benefits as other FE employees, but that "based on [his] special pension benefit agreement with DLC, a modification" would be permitted allowing his service "*for the purposes of calculating the supplemental pension benefit* [to] be increased to seven (7) years." (1st Offer Letter at 705 (emphasis added).)

Plaintiff does not even address the Board's determination that the application of the "two-for-one" arrangement with DLC would not be permitted under FE's qualified ERISA plan. Rather, he complains that the Board did not engage in "deliberate, principled" decision making because FE, "in the 1999 offer letters and the discussions its benefits representatives had with Pearson both before and after he became an FE employee (and even after he departed), miserably failed to clarify for Pearson that there was some benefit program, other than the Plan,

---

[8]The Supplemental Benefit Plan appears to be a "top hat" plan, as it is only available to executive level employees and, as the Executive Letter provides, "[d]ue to federal tax laws, the benefits provided by the EDCP are not funded." (Executive Letter at 367.) "Top hat plans are almost completely exempt from ERISA substantive requirements." *Simpson v. Mead Corp.*, 187 F. App'x 481, 483-84 (6th Cir. 2006) (citation omitted); *see Tate v. Gen. Motors LLC*, 538 F. App'x 599, 602-03 (6th Cir. 2013) ("While 'top hat' plans are covered by ERISA, they are not subject to many of the substantive standards required of other retirement plans, such as participation, vesting, accrual, funding, fiduciary responsibility, disclosure and reporting. These exceptions are made in recognition of the ability of high level employees to influence or negotiate elements of their compensation packages, eliminating the need afforded other employees under ERISA.") (citations omitted).

that it asserts was the source of Pearson's promised 'supplemental' benefit."[9] (Opp'n at 1249-50.) He suggests that "FE's assumption that an employee, even an executive like Pearson, would know the difference between a qualified plan and a non-qualified plan is astounding and irrational." (*Id*. at 1250.)

Regardless of the deficiencies plaintiff perceives in FE's offer letters or other communications with Pearson (many of which were not part of the administrative record and beyond the scope of this Court's review of the merits of Count One)[10], the administrative record supports the Board's reasoned explanation for the denial of Pearson's claim. Further, while plaintiff believes that the Court should "think long and hard" about the manner in which FE dealt with Pearson as evincing deceptive motive, plaintiff acknowledges that the record "arguably supports" the Board's decision. (Opp'n at 1252.) Nothing more is required to uphold an ERISA benefits administrative decision. *See Abbott*, 94 F.3d at 240-41 (ERISA denial of benefit should be upheld where outcome rationally supported by the record). Because the Court cannot conclude that the Board acted arbitrarily and capriciously in resolving Pearson's appeal, defendants are entitled to judgment on Count One.

## IV. SUMMARY JUDGMENT STANDARD

The remainder of the arguments contained in defendants' dispositive motion must be considered under the summary judgment standard set forth in Rule 56 of the Federal Rules of

---

[9] The record does not support this contention. As set forth above, the supplemental pension benefit was addressed in both offer letters, and, as plaintiff admits, was referenced and explained in the Executive Letter, under the discussion of the EDCP. (Executive Letter at 367; Opp'n at 1246 n.11.)

[10] Plaintiff complains that the Court does not have before it the complete administrative record because certain emails exchanged between him and members of the Board were not appended to defendant's summary judgment motion. Plaintiff fails to supply these emails, or explain how consideration of these emails would alter the analysis for Count One.

Civil Procedure. When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Moreover, "[t]he trial court no longer has the duty

17

to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

## V. MERITS OF THE BREACH OF FIDUCIARY DUTY CLAIM

Plaintiff's second cause of action has presented somewhat of a moving target. From the time plaintiff filed the FAC to the time he opposed summary judgment, plaintiff has repeatedly attempted to redefine the factual and legal underpinnings of this claim. Regardless of what facts he relies upon, and regardless of whether the Court treats Count Two as a breach of fiduciary duty claim or an equitable estoppel claim (as plaintiff now suggests the Court should do), the claim fails as a matter of law because it is missing a key ingredient—a material misrepresentation. *See Bloemker v. Laborers' Local 265 Pension Fund*, 605 F.3d 436, 442 (6th Cir. 2010) (to be entitled to equitable estoppel under ERISA, plaintiff must prove, among other things, "conduct or language amounting to a misrepresentation of a material fact"); *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002) (Participants and beneficiaries may assert claims for breach of fiduciary duty where plan fiduciaries make materially misleading misrepresentations regarding the extent or availability of benefits under the plan).

The FAC focuses on the representations individuals, including Mileski and

Mucci, made to plaintiff *before* he accepted employment with FENOC. Complaint allegations stress the language in the two 1999 offer letters that mention plaintiff's prior credit accruing relationship with DLC, and the conversations plaintiff had with FE employees "when negotiating his terms of employment with FENOC[.]" (FAC ¶¶ 17-24.) In support of summary dismissal of Count Two, however, defendants argue that plaintiff cannot rely on the 1999 offer letters and pre-employment conversations plaintiff had with FE representatives. According to defendants, such pre-employment representations cannot serve to bind them because, at the time they were made, plaintiff was not a "participant" in the FE Pension Plan. The Court agrees.

In *Thurman v. Pfizer, Inc*., 484 F.3d 855 (6th Cir. 2007), the plaintiff alleged that pre-employment promises by his prospective employer regarding his projected monthly pension benefit induced him to leave his prior job and relocate his family in order to work for the defendant. The Sixth Circuit rejected the employer's position that the plaintiff's common law misrepresentation claim was preempted by ERISA. The court recognized that, in order for the plaintiff to have brought a § 1132 under ERISA for breach of fiduciary duty, "a fiduciary relationship must have existed between the parties at the time the alleged misrepresentation was made." *Id*. at 860. Because the plaintiff was merely a "potential employee" at the time the alleged representations were made, "[h]e was not yet a participant or beneficiary under the plan and, therefore, no fiduciary relationship existed." *Id*.; *see also Spragg v. Pac. Telesis Grp*., No. 97-15541, 1999 WL 51489, at *2 (9th Cir. Jan. 27, 1999) ("at the time AT & T allegedly represented to Spragg that he would be classified as an independent contractor, AT & T had no fiduciary duty to Spragg, pursuant to ERISA, because Spragg was not yet a participant in AT & T's ERISA plan"). Similarly here, plaintiff was merely a "potential employee" at the time he

19

negotiated the terms of employment with FE and FENOC. Because he was not yet a participant in the FE Pension Plan, defendants owed no fiduciary duty to him, and, as a result, the pre-employment representations, both oral and in writing, are legally insufficient to support his ERISA breach of fiduciary claim.

Of course, these alleged representations are also factually insufficient to stave off summary judgment. There is nothing in the 1999 offer letters that can be construed as a promise to honor the "two-for-one" service arrangement plaintiff had with DLC, and plaintiff admitted as much in his deposition. "[D]isappointed" by the language in the first offer letter because it did not include his special arrangement, plaintiff spoke with Mucci and Mileski, who confirmed that he would not (and could not) receive the same deal and, as a result, would not have the necessary 10 years of service after five years of employment. (Pearson Dep. at 579-83, 586.) According to plaintiff, he "gave in" on this point, and there is nothing in the record to suggest that he was ever promised the deal during the meeting or in the second offer letter, which contained the same language regarding pension benefits, and which plaintiff admits was accurate. (*Id*. 583-84.)

In his opposition brief, plaintiff essentially concedes that these pre-employment representations cannot support his § 1132 claim, and shifts his focus to post-employment representations. (Opp'n at 1247-48 n.13 ("Defendants' argument concerning the pre-employment communications is inapposite given FE's post-employment representations.") (record cites omitted). While not mentioned in the FAC, plaintiff now points to two written documents he received shortly after becoming an FE employee in 1999. The first document, the 1999 Newsletter sent to all employees of the Beaver Valley plant, summarized the contents of the former DLC employees' new benefits as FE employees. (1999 Newsletter.) The second

document was also a form letter—this one sent to all executive level employees—that also summarized available FE benefits. (Executive Letter.) Once again, these documents are factually insufficient to support an ERISA breach of fiduciary duty claim, as plaintiff cannot point to anything in these documents that was false or contained a material misrepresentation.

The Executive Letter assured the former DLC employees that their "combined service and earnings from Duquesne Light and FirstEnergy will be used to calculate the benefit payable from the FirstEnergy Pension Plan." (Executive Letter at 366.) This representation, as applied to plaintiff, was true as plaintiff was given credit for his time working at DLC for purposes of determining his service under the FE Pension Plan, and plaintiff does not deny this.[11] The document does not make any reference to any prior individual service accruing agreements, and this form letter cannot be construed as a promise to award *plaintiff* two years for each year with DLC. Likewise, the 1999 Newsletter simply advises all former DLC employees that their "service and earnings will transfer to" the FE Pension Plan. (1999 Newsletter at 356.) Again, there is no representation that Pearson would receive two times his service at DLC for purposes of calculating service for the FE Pension Plan. Moreover, while plaintiff suggests that these documents "apparently contained false information," he fails to identify any misrepresentations contained therein. (Opp'n at 1247.) *See Bailey v. U.S. Enrichment Corp.*, 530 F. App'x 471, 476 (6th Cir. 2013) ("Plaintiffs have not shown any misrepresentation…. They only claim reliance on

---

[11] As set forth above, plaintiff was credited with more than 5 years of service under the FE Pension Plan. Pearson started with FENOC in late 1999 and left in 2003 (a little more than 4 years), but his prior service time and pension earnings with DLC were included to give him slightly more than 5 years of service under the Plan, which accounted for the July 1998 to December 1999 period he worked for DLC. The evidence also shows that plaintiff received two-for-one credit with respect to the supplemental pension benefit, consistent with the 1999 offer letters. (*See* Doc. No. 43 (Deposition of Christine Kuhlke ["Kuhlke Dep."] at 1187) ("We took into account the two for one with Duquesne and not only did we take this into account the two for one with Duquesne, the asset transfer was December 26th of 1999. If you look at Exhibit 4, we actually continued to honor the Duquesne Agreement through December 31st of 2001.").)

21

the HR document, but the terms of that document are not inconsistent with the terms of the [p]lan as interpreted by [defendant] . . . Plaintiffs fail to state a claim for equitable estoppel.") Further, Mileski provided uncontroverted testimony that the Executive Letter was accurate. (Mileski Dep. at 303-04.)

Rather, plaintiff was consistently advised by defendants that FE would *not* honor the special arrangement he had with DLC for purposes of calculating service for the FE Pension Plan. Plaintiff admits that this was explained to him in the meeting with Mileski and Mucci before he commenced employment with FE and FENOC, and this was further explained in the 1999 offer letters. Then, throughout his employment, plaintiff received confirmation that his service credit would not be calculated on a "two-for-one" basis. For example, the 2002 Personalized Projection of his pension benefit clearly did not include such a calculation, but plaintiff chose to ignore it as propaganda. (2002 Ben. Stm. at 731; Pearson Dep. at 623-24.)

Plaintiff now offers a declaration, prepared after his deposition in this case and after summary judgment was filed, in which he states that he received a similar document in 2000. Believing that the projected monthly pension benefit was lower than he expected because it did not include the extra service credit from DLC, plaintiff states that he "contacted [his] human resources representative at the Beaver Valley plant . . ." who advised him that "the annual compensation summaries were created by an automated process and so they did not take into account any individual contract or other arrangement I may have had with the company, and [he] should not expect that such unique terms would be a part of such a summary." (Doc. No. 44-7 (Pearson Decl. ¶ 9.) Based on this representation, plaintiff claims that he "did not believe that [he] needed to worry about whether the 2000 summary or similar future summaries met my

expectations about my monthly benefit from the Plan." (*Id.*) There are several problems with plaintiff's position. Initially, the Court notes that plaintiff does not represent that he was advised by anyone at FE that he had a special service crediting arrangement that carried over from his DLC service. Rather, his declaration makes clear that he was merely advised that, if an individual had a contract or other arrangement with the company, it would not be reflected in the benefits statement. (*See id.*)

Second, and more fundamentally, the declaration cannot be relied upon to generate a genuine issue of material fact on summary judgment because it contradicts his deposition testimony. Prior to offering his declaration, plaintiff testified in his deposition that, after speaking with Mucci and Mileski in 1999, he did not speak with *anybody* from FE about his pension benefit until he began periodically contacting Meader, beginning in 2005, in order to obtain a pension benefit calculation. (Pearson Dep. at 587.)[12] It is well settled that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (citation omitted). Instead, "[t]he rule . . . is that a party opposing summary judgment with an affidavit that contradicts [his] earlier deposition must explain why [he] disagrees with [himself]." *Powell-Pickett v. A.K. Steel Corp.*, 549 F. App'x 347, 352 (6th Cir. 2013) (citing *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 877 (6th Cir. 2012)); *see Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006) ("A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides

---

[12] Plaintiff qualified his response by stating that he discussed the matter, again, with Fred Giese while the two were going through his termination paperwork in 2003. (*Id.* at 587.)

a persuasive justification for the contradiction.") (citation omitted). Plaintiff offers no justification for his contradictory declaration on a key issue in this case, and the Court will, therefore, not consider this portion of his post-deposition declaration.

For the same reason, plaintiff cannot rely on the portion of his declaration wherein he avers that:

> Lew Myers, a senior manager for FENOC at the Beaver Valley site, discussed my Plan benefit with me *after I became an FE employee* on several occasions. During those conversations, among other things, we discussed whether my time with DLC was to be added to my service credit for time with FE, and when I told him that I believed that it should be added, he agreed with me. His stance on the issue was consistent with the prior representations made to me by the FE benefits representatives that my DLC time would be added to my service credit under the Plan when calculating my Plan benefit.

(Pearson Decl. ¶ 8 (emphasis added).) In his deposition, plaintiff testified that he spoke with Lew Myers regarding his pension benefits *before* he came to work for FENOC. (Pearson Dep. at 575, 590.) Again, plaintiff was specifically asked whether he spoke with anyone about his benefits after he accepted the position with FENOC, and he responded that he did not until he began calling Meader. (*Id*. at 587.) He offers no explanation for why he failed to mention that he spoke with Myers "on several occasions," when he was specifically questioned about both his pre- and post-acceptance conversations with FENOC employees.[13] Further, plaintiff declares that, in his

---

[13] In reference to a letter plaintiff created at the time of his termination, plaintiff did testify that he contacted Lew Myers five days before he spoke with Fred Giese about his termination paperwork. According to plaintiff, he reminded Myers about the offer letters back in 1999 and the details about his prior arrangement with DLC. (Pearson Dep. at 599-600; Doc. No. 39-1 (May 7, 2003 Letter).) Myers told him "You know, your benefits – your benefits are as what we talked about back then." (Pearson Dep. at 600.) Myers purportedly also told plaintiff that his benefits would be as they were reflected in the original offer letters in 1999. (*Id*. 601-02.) It is clear from plaintiff's deposition testimony that plaintiff was recounting his pre-employment discussion with Myers, and there is no indication that he was promised the "two-for-one" arrangement in the 1999 offer letters. (*See id*. at 604 (recounting the pre-employment discussion in 1999).) This fact is further confirmed by the handwritten note plaintiff made to the 2nd Offer Letter, wherein he mentions the pre-employment discussion with Myers on August 30, 1999. (*See* 2nd Offer Letter at 707.) Nor does plaintiff suggest that Myers did anything more than reference those prior letters, or make any new promises, in that telephone discussion in the days leading up to his discharge.

several conversations with Myers, the two merely discussed "whether my time with DLC was to be added to my service credit for time with FE[.]" (Pearson Decl. ¶ 8.) Again, plaintiff's DLC time was included in his service calculation. Plaintiff does not aver that Myers, or any other FENOC employee, told him that he would receive a "two-for-one" calculation of his time.[14]

Additionally, the alleged oral misrepresentations contained in plaintiff's declaration are legally insufficient to support what plaintiff is now characterizing as an equitable estoppel claim. As plaintiff concedes, when the language of an ERISA plan is unambiguous, an equitable estoppel claim is subject to a heightened standard. (Opp'n at 1248 ("[A]s the Court likely is aware, estoppel claims can and do proceed where there is no ambiguity in plan terms, which serves to place a higher burden on Pearson . . . .").) *See Bloemker*, 605 F.3d at 444. This heightened standard requires, among other things, proof of a *written* representation. *Id*. Plaintiff does not suggest that the written language of the FE Pension Plan is ambiguous, and he is, therefore, required to come forward with written misrepresentations that support his claim. As set forth above, plaintiff is unable to do so. Accordingly, because plaintiff has failed to identify a genuine issue of material fact as to whether defendants, or their representatives, made material misrepresentations to him regarding his pension benefits, defendants are entitled to summary judgment on Count Two.

## VI. TIMELINESS OF BREACH OF FIDUCIARY DUTY CLAIM

Defendants believe that they are entitled to summary judgment on Count Two for

---

[14] Plaintiff also testified that, at the time of discharge, he discussed with Fred Giese the language in the summary of benefits document he received as part of his separation paperwork. (*See* Ex. Int. Ben. Info.) While he stated that he mentioned the agreement with FE, which he maintained contained the "two-for-one" arrangement, he never testified that Giese told him that he had such an arrangement with FE. Instead, plaintiff testified that Giese "revised" the separation paperwork, but plaintiff has failed to point to any portion of the paperwork that promised him the "two-for-one" deal. (Pearson Dep. at 587-89.)

the additional reason that it is time-barred. According to defendants, the six-year limitations period found in § 413 (29 U.S.C. § 1113) of ERISA applies to Count Two, and serves as "'an absolute barrier to an untimely suit.'" (MSJ/JAR at 790 (quoting *Radford v. Gen. Dynamics Corp.*, 151 F.3d 396, 400 (5th Cir. 1998).) Applying § 413, defendants argue that the six-year limitations period began to run in 1999, when "various FE representatives allegedly 'made various representations to [Pearson] concerning the Plan.'" *Id.* at 791 (quoting FAC ¶¶ 16, 22-23, 24.) Because plaintiff did not bring suit in federal court until March 23, 2014, more than fourteen years after the 1999 representations involving Pearson's "two-for-one" pension agreement, defendants insist that Count Two is clearly time-barred. (MSJ/JAR at 790 (quoting, among authority, *Spangler v. Altec Int'l L.P.*, No. 98-2437, 1999 WL 66189, at *3 (7th Cir. Feb. 9, 1999) (The limitations period prescribed by § 413 "begins to run when the violation or breach occurs, regardless of when the injury is felt.")) (citation omitted).

Plaintiff disagrees. Plaintiff argues that, by its express terms, § 413 only applies to claims brought to redress a fiduciary's breach under §§ 401-412 (29 U.S.C. § 1101-1112), and cannot, therefore, apply to plaintiff's breach of fiduciary claim, which is brought under § 502(a)(3) (29 U.S.C. § 1132(a)). (Opp'n at 1233.) Because ERISA does not prescribe a limitation period for claims under § 1132(a)(3), plaintiff suggests that the Court should look to Ohio law for the most analogous state limitations period. (*Id.* (citing, among authority, *Med. Mut. of Ohio v. k. Amalia Enters.*, 548 F.3d 383, 390 & n.5 (6th Cir. 2008).) According to plaintiff, the most analogous period is the six-year limitations period for breach of contract claims under Ohio law. (*Id.* at 1234.) Further, plaintiff suggests that the "discovery rule" should apply to this Ohio limitations period and argues that he did not discover that he would not get the additional credit

26

under the FE Pension Plan "until he received the pension estimates from FE (by Christine Kuhlke) in January 2013 . . . ." (Opp'n at 1235.) Having commenced this litigation within six years of this "discovery," plaintiff insists that Count Two is timely.

There is support for plaintiff's position. In *Varity v. Howe*, 516 U.S. 489, 512, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996), the Supreme Court recognized that 29 U.S.C. § 1132(a) is broad enough to permit lawsuits for individualized equitable relief for breach of fiduciary duty obligations under § 404(a) of ERISA. Some courts have held that *Varity* claims are not subject to the limitations period in § 1113 because that section is "only applicable to actions arising out of violations" of fiduciary duties outlined in §§ 1101-12, dealing with "financial solvency or accountability[.]" *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1290 (10th Cir. 1991); *see Bull v. Sara Lee Corp.*, No. 1:09-cv-0049, 2010 WL 1266481, at *5 n.2 ("The statute of limitations provided by 29 U.S.C. § 1113 applies only to suits brought to redress a fiduciary's breach of its responsibilities, duties, or obligations under ERISA.") (citing *Med. Mut. of Ohio*, 548 F.3d at 391); *Kilpatrick v. Intertrade Holdings, Inc.*, No. 1:02-CV-173, 2003 WL 21938912, at *3 n.2 (E.D. Tenn. July 7, 2003) ("Although a claim under § 1132(a)(3) can be described as a claim for breach of fiduciary duty, the statute of limitations found in § 1113 does not apply. The limitations found in § 1113 have been held to apply only to the breaches described in §§ 1101-1112.") (citation omitted).

This treatment of the time limit for filing *Varity* claims, however, is far from universal. In *Radford*, a Fifth Circuit decision involving an extremely similar fact pattern, the plaintiff brought suit under ERISA, alleging that plan representatives misrepresented to him what his monthly pension benefit would be at retirement. The court ruled that plaintiff's claim was

27

untimely under § 413, finding that "[t]he plain language of § 413 of ERISA indicates that its statute of limitations would apply to a *Varity* claim pursuant to § 502(a)(3)." *Radford*, 151 F.3d at 399.  In reaching the conclusion that § 413 applied, the court noted that the plaintiff's *Varity* claim arose under § 404(a), the same Subchapter I, subtitle B, Part 4 of ERISA where § 413 is located. *Id*.; *see Cherochak v. Unum Life Ins. Co. of Am*., 586 F. Supp. 2d 522, 529 (D.S.C. 2008) (collecting cases applying § 413's limitations period to breach of fiduciary claims brought pursuant to § 1132).

While this issue remains unsettled in the case law, it is academic for purposes of defendants' summary judgment motion because both sides arrive at the same six-year limitations period (albeit through different routes). The actual disagreement lies in the determination of when plaintiff's breach of fiduciary claim accrued for purposes of evaluating the timeliness of the claim. Even if the Court adopts plaintiff's more generous "discovery rule," instead of § 413's more restrictive "time of the breach" rule, the claim is still time-barred. Whether the claim accrued when plaintiff received the 2002 personalized calculation, when he signed the discharge paperwork on January 4, 2004, or when he received the October 22, 2004 letter identifying the projected amount of his monthly pension benefit at age 65, the action was still not filed within

the six-year limitations period.[15] (*See* Pearson Dep. 617; Ex. Int. Ben. Info; Oct. 22, 2004 Letter.)

Since plaintiff did not file suit until March 23, 2014, more than 6 years after any one of the

possible accrual dates, Count Two is time-barred.[16]

## VII. RELEASE OF BOTH CLAIMS

Finally, defendants argue that summary judgment on both claims is appropriate

because plaintiff waived these claims when he signed the release and waiver agreement in 2004.

As set forth above, the release purported to cover "any and all claims, liabilities, demands, and

---

[15] As to this last date, plaintiff suggests that within weeks of receiving the letter containing the projected monthly benefit, he received another letter from FE in which he was informed that he was eligible for an unreduced pension at age 60 because he had 10 or more years of service at the time of separation. (Pearson Dep. at 628-9.) It is undisputed, however, that plaintiff did not produce the letter in discovery. (*Id.* at 630-31.) The Court finds that plaintiff's deposition testimony regarding the contents of this missing letter cannot be relied upon to create a genuine issue of material fact. Under Rule 1002 of the Federal Rules of Evidence, the original writing is generally required to prove the content of the writing. Fed. R. Evid. 1002. Under Rule 1004(a), however, the original is not required, and other secondary sources may be relied upon, if the original is lost or destroyed. Fed. R. Evid. 1004(a). "The proponent of the secondary evidence has the burden of proving loss or destruction, which are preliminary facts for the court to determine under Rule 1004(a). Thus, the proponent must show by a preponderance of the evidence that all originals have been lost or destroyed. This means that the burden is not sustained where the proponent merely casts doubt as to the existence of the original." Wright & Gold, *Federal Practice and Procedure*: Evidence § 8014. The Court finds that plaintiff has not met his burden of establishing that the missing letter is lost. While plaintiff testified that he looked unsuccessfully for the letter and believes that it may have been destroyed when he gave it to his daughter and her basement subsequently flooded (*see* Pearson Dep. at 630-34), defendants were unable to locate any such letter and have offered evidence tending to show that it was not company policy to send out this type of communication. (Doc. No. 40-16 (Feb. 8, 2013 email) at 986; Doc. No. 43 (Deposition of Christine Kuhlke ["Kuhkle Dep."]) at 1197.) Additionally, the Court notes that the record demonstrates that plaintiff was able to produce hundreds of pages of documents in this case, and, as such, it is less likely that the one document that supports plaintiff's position on his service credit was lost. (Pearson Dep. at 630.) For all of these reasons, the Court finds that plaintiff has failed to meet his burden of showing that his deposition testimony may serve as a substitute for the original letter. *See, e.g., Warden v. PHH Mortg., Corp.*, 799 F. Supp. 2d 635, 643 (N.D. W. Va. 2011) (deposition testimony regarding missing letter could not be used to defeat summary judgment where plaintiff was not diligent in his search and had successfully produced nearly 300 pages of documents in his disclosures).

[16] According to plaintiff, the efforts he made to contact Meader, beginning in 2005, demonstrate his diligence in pursuing his rights under the FE Pension Plan and should serve to toll the limitations period. *See Engleson v. Unum Life Ins. Co. of Am.*, 723 F.3d 611, 623 (6th Cir. 2013) (identifying "diligence in pursuing one's rights" as one of the factors to consider under the Sixth Circuit's five-part equitable tolling test). To the extent that § 413 applies to plaintiff's breach of fiduciary duty claim, equitable tolling is simply not available because § 413 is a statute of repose. *See Lampf, Plev, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363, 111 S. Ct. 2773, 115 L. Ed. 2d 321 (1991). Even if the court borrows the limitation period from state law, the fact that plaintiff waited years after receiving repeated confirmation that he did not have the service credit he thought he should have to contact Meader demonstrates that he did not diligently pursue his rights.

causes of action, known or unknown, fixed or contingent," relating to plaintiff's employment at FENOC. (Separation Agreement at 713.) Plaintiff insists that the waiver language is invalid because it impermissibly purports to waive future ERISA claims.

"The Sixth Circuit has repeatedly upheld dismissals of ERISA causes of action based upon the plaintiffs' execution of valid waiver and release agreements in connection with the termination of their employment." *Badalament v. United of Omaha Life Ins. Co.*, No. 05-CV-74932-DT, 2009 WL 3081499, at *6 (E.D. Mich. Sept. 23, 2009) (collecting cases). Such waivers are enforceable provided that they are knowing and voluntary. *See Sullivan*, 518 F. Supp. 2d at 994 (citing *Shaheen v. B.F. Goodrich Co.*, 873 F.2d 105, 107 (6th Cir. 1989)); *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1481 (6th Cir. 1989).

The Sixth Circuit considers the following factors in determining whether waivers of employment claims are knowing and voluntary: (1) the employee's experience, background and education; (2) the amount of time the employee has to consider the release, including whether he had the opportunity to consult with an attorney; (3) the clarity of the release; (4) the consideration for the release; and (5) the totality of the circumstances. *Nicklin v. Henderson*, 352 F.3d 1077, 1080 (6th Cir. 2003) (citation omitted). Federal courts have utilized these same factors in evaluating the voluntariness of waivers of ERISA claims.[17] *Badalament*, 2009 WL 3081499, at *6 (collecting cases).

---

[17] Defendants correctly note that, while pension entitlements are subject to the anti-alienation provision of ERISA, 29 U.S.C. § 1056(d)(1), contested pension claims are not subject to the provision and can be alienated. (MSJ/JAR at 787 (citing, among authority, *Hakim v. Accenture U.S. Pension Plan*, 718 F.3d 675, 681 (7th Cir. 2013).) "A pension entitlement arises under the terms of the pension plan itself." *Hakim*, 718 F.3d at 681 (citation omitted). A contested claim, by contrast, "does not seek benefits to which the plaintiff believes he is entitled under the terms of the pension plan itself, but rather for additional benefits above and beyond the benefit to which he is entitled under the terms of the plan." *Id*. at 682. Both of the claims in the FAC seek additional benefits above and beyond the FE Pension Plan, premised upon the "two-for-one" arrangement plaintiff negotiated with DLC. As such, both can be categorized as contest claims, and are, as a result, beyond the reach of ERISA's anti-alienation provision.

A balancing of the factors listed above demonstrates that plaintiff's waiver of his ERISA claims was knowingly and voluntarily executed. It is undisputed that, at the time Pearson executed the release, he was 50 years old, possessed a bachelor degree and a MBA, and had over 20 years of experience in the workforce. (Pearson Dep. at 543, 550-51, 594.) The separation agreement provided for 45 days to consider the offer and seven days to revoke his acceptance, and Pearson availed himself of the consideration period. (Pearson Dep. at 609 (The separation agreement was dated November 17, 2003, and Pearson did not sign it until January 3, 2004).) The document also contained language encouraging Pearson to consult with an attorney before signing it. (Separation Agreement at 711-14.) Additionally, the release was supported by substantial consideration, including a severance payment of $137,563. (*Id*. at 712) These four factors all clearly weigh in favor of a finding that the waiver was voluntary and knowing.

As to the final factor—clarity of the release—plaintiff makes several arguments. First, noting that the release carved out claims that might arise after the execution of the agreement, plaintiff suggests that the release cannot apply to plaintiff's claims because they arose after he signed the agreement, and future ERISA claims cannot be compromised via a waiver. The Court agrees that the use of the language "may now have or claim to have" clearly limits the reach of the waiver to claims that existed at the time of execution. The Court further agrees with plaintiff that it is, at the very least, questionable as to whether future ERISA claims can be waived. *See Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan*, 711 F.3d 675, 685 (6th Cir. 2013) (collecting cases holding that a participant cannot be required to release future ERISA claims); *Sullivan*, 518 F. Supp. 2d at 998 (citing, among authority, *Barron v. UNUM Life Ins. Co. of Am.*, 260 F.3d 310, 317 (4th Cir. 2001)).

31

The Court cannot, however, agree with plaintiff that the claims in the FAC had not arisen at the time he executed the release. As set forth in the statute of limitations section above, plaintiff became aware, or should have become aware, that FE was not going to apply the "two-for-one" service arrangement to his FE pension benefit no later than the date of his separation, when he received the benefits information that plaintiff agrees made clear that his service with DLC would not be doubled for purposes of pension benefits. (Ex. Int. Ben. Info. at 719; Pearson Dep. at 617.)[18] *See, e.g., Hakim*, 718 F.3d at 683 (finding that plaintiff's § 204(h) ERISA claim accrued when the plaintiff became aware or should have become aware of the change in the plan that affected his right to participate in the plan). It is undisputed that plaintiff had an opportunity to review this information before he signed the separation paperwork. Because plaintiff knew by 2004 that he was not receiving the benefit of the "two-for-one" agreement as to his FE pension benefits, which he maintains was contrary to prior representations made by defendants, both claims had accrued before he signed the separation papers.

Equally unavailing is plaintiff's suggestion that the release cannot effectively waive ERISA claims because the release "focused on the waiver of employment discrimination claims (particularly, age discrimination claims)[.]" (Opp'n at 1242.) Regardless of how plaintiff characterizes the release, its broad language was amply sufficient to cover *all* claims plaintiff had

---

[18] This conclusion is not changed by plaintiff's citation to *Schumacher*. There, the Sixth Circuit found that plaintiff's "whipsaw calculation" claim had not yet arisen at the time the plaintiff executed the release. The court explained that, by its unique nature, a "whipsaw calculation" claim "'arises when participants opt to 'cash out' their hypothetical accounts before they reach normal retirement age." *Schumacher*, 711 F.3d at 684 (quoting *West v. AK Steel Corp.*, 484 F.3d 395, 400 (6th Cir. 2007)). As a result, the court concluded that the plaintiff's whipsaw claim "could not possibly arise until the moment a class member opted to cash out her pension in lump-sum form. Because none the class members requested a lump-sum payment until *after* the execution of the Severance Agreements, their claims had not accrued." *Id.* (emphasis added).

or believed he had against defendants at the time he signed it. *See Taylor v. Visteon Corp.*, 149 F. App'x 422, 425-6 (6th Cir. 2005) (applying Michigan law and finding similarly broad language sufficient to cover ERISA claims, including "at-the-moment-of-signing claims").

   The Court finds that application of the five-factor analysis compels the conclusion that the waiver was entered into knowingly and voluntarily. Because the waiver operates as a valid and enforceable release of the ERISA claims contained in the FAC, defendants are entitled to summary judgment as to both claims for this additional reason.

**VIII.** **CONCLUSION**

   For all of the foregoing reasons, defendants' motion for summary judgment on Count One and Two of the First Amended Complaint and/or judgement on the administrative record on Count One (Doc. No. 40) is granted, and the First Amended Complaint is dismissed with prejudice.

   **IT IS SO ORDERED**.


Dated: February 8, 2016

           **HONORABLE SARA LIOI**
           **UNITED STATES DISTRICT JUDGE**

33